UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW GRAVES,<br><br>    Plaintiff,<br><br>v.<br><br>PATRICK COVELLO,<br><br>    Defendant. | Case No. 21-cv-03186-JCS<br><br>**ORDER TO SHOW CAUSE** |

## I. INTRODUCTION

Petitioner Matthew Graves brings a petition seeking federal habeas relief from his state conviction in San Mateo County Superior Court, case 16-NF-011327-A ("the State Action"), for pimping a minor 16 or older, pandering a minor 16 or older, forcible human trafficking of a minor for a sex act, and dissuading a witness, in violation of California Penal Code sections 266h(b)(1), 266i(b)(1), 236.1(c)(2) and 136. The Petition is now before the Court for review pursuant to 28 U.S.C. § 2243 and Rule 4 of the Rules Governing Section 2254 Cases. Petitioner is currently incarcerated at Mule Creek State Prison, P.O. Box 409099, Ione, CA 95640. The Court finds that Petitioner's claims are sufficient under 28 U.S.C. § 2254 to warrant an answer. Therefore, Respondents shall file an answer or dispositive motion in response to the habeas petition within 60 days of the date of this Order.

## II. BACKGROUND

According to Petitioner, witnesses employed at the Red Roof Inn where some of the relevant events occurred, officers called to the scene or involved in the investigation, the alleged victim of Petitioner's sex crimes, Jane Doe ("JD") and JD's grandmother testified in the State Court action. JD allegedly offered the following testimony:

JD testified that she was born on January 29, 1999 making her 18, but 16 at the time of the crimes. (RT 6: 248.) JD testified the tattoo on her hand was MG 50, which were GRAVES initials and football jersey number. (RT 6: 249.) She claimed she met GRAVES in October of 2015. (RT 6: 249-250.) The night they met, JD claims she was in Jack London Square and GRAVES and a friend were driving in a Maserati and she liked the car and jumped in with them. (RT 6: 250-251.) She testified she was high and that she "just wanted to get high" and that it was all a blur because she was on crystal meth, cocaine, and alcohol, but remembers picking up a friend and partying and waking up at GRAVES house. (RT 6: 252-253.) JD claimed she was back and forth from hotel rooms with GRAVES and living at GRAVES home. (RT 6:254.) She was in the 10th grade when she met GRAVES. (RT 6: 255.) She admitted she asked GRAVES to get her hair and nails done because she was "superficial." (RT 6: 255.)

JD claimed GRAVES offered her either a pimp/prostitute relationship or a love-based relationship. She chose the pimp/prostitute relationship, but loved him. (RT 6: 255-256.) She admitted this was not forced upon her, but it was about making money and that she made the choice on her own. (RT 6: 255-256.) JD claimed GRAVES "took control" at this point, but that she made the ad on "Backpage" with him. (RT 6: 256-257.) She admitted that the solicitors for her services called her, not GRAVES. (RT 6: 257-258.) She claimed she lost her cell phone, and that GRAVES gave her one. (RT 6: 258-259.) She claimed GRAVES wrote an ad and that a quickie was $50 an hour and prices went up from there. (RT 6: 259-260.) She admitted she had cell phone prefixes of 510, 707, and 650. (RT 6: 251.) She admitted she knew how to, and had, taken provocative pictures of herself with a self-timer. (RT 6: 262.) She claimed it was not unusual for GRAVES to have her phone. (RT 6: 263.) JD admitted the tattoo was not forced upon her but was her idea and that this happened when she was in love with him. (RT 6: 264-265.)

She did not remember the first time GRAVES acted as her pimp, but she remembered a time in Burlingame, although she admitted she arranged that entire transaction. (RT 6: 267.) She was unsure if it was arranged on her phone or the one GRAVES gave her because she booked her appointments on more than one phone. (RT 6: 267.)
She claimed that GRAVES "came to see her the next day" and that he got mad because she didn't have enough money and that he would become abusive when that happened. (RT 6: 269-270.) Yet she claims her pimp had no specific agreement with her about how much money he was to receive. (RT 6: 270-271.) She claims on one occasion GRAVES became abusive when she would not get out of the car to go to a sexual appointment, but then claimed she could not recall details because she was high and paranoid. (RT 6: 269-270.) She said another time GRAVES was abusive when she was high on crystal meth, the hallucinogenic LSD and cocaine, because he didn't like the amount of money she had made. (RT 273-274.) She claimed the third incident of abuse was the day before she "ran away from him." (RT 6: 273-274.) She admitted that her clients provided her drugs, not GRAVES, and that GRAVES did not like her being high. (RT 6: 274.) She admits she was a drug addict. (RT 6: 275.) She admitted that she would take drugs for sex and then disappear and lie when people tried to find her. (RT 6: 274-275.) She felt GRAVES was abusive towards

2

her once because she would not work, and once because she did not get enough money. (RT 6: 276.) She admitted it was not GRAVES' job to keep her from getting beaten up while she was working. (RT 6: 276.)

JD denied she had a physical altercation with Joan, but admitted she told the police this. (RT 6: 277-278.) She admitted she changed her story often initially; that she was high and addicted and has no recollection of all she said. (RT 6: 278-279.) She claimed she committed somewhere between 10 and 20 sex acts with GRAVES as her pimp. (RT 6: 279-280.)

JD was shown texts from her grandmother's phone with GRAVES, but did not remember them. (RT 6: 280-281.) She admitted she had secret nicknames other people used which GRAVES knew nothing about. (RT 6: 281-282.) She has little recollection of these texts because she was having panic attacks and was high. (RT 6: 283.) She admitted she was delusional and always intoxicated during this period. (RT 6: 285 286, 290.) She had no recollection of being admitted to Kaiser hospital and acknowledged she had injuries from that December 6th admission to Kaiser. (RT 6: 287.) When discussing a text where she asks GRAVES not to beat her, she used the phrasing "for the one-time SMDH" (although she admitted he only abused her a couple times). (RT 6: 288- 289.) In spite of claiming she was delusional; she claimed pictures of bruising around her eye and on her arm were from GRAVES. (RT 6: 291-292.)

When she ran from GRAVES, she claims she went down to the office at the RR, the clerk told her to get on the shuttle, she was then seen by a couple at the airport who summoned help, and then she was taken to the hospital. (RT 6: 292-293.) She testified that GRAVES took a number of pictures with her, some before the MG tattoo. (RT 6: 294-297.) She recalled jail calls from GRAVES to her grandmother's home. (RT 6: 298.) JD then described GRAVES alleged pimping operation, claiming a woman named Nana was the "bottom bitch" (lead prostitute) and that he also has Joan. (RT 6: 300-301.) This was the Joan she said had beaten her causing the injuries now attributed to GRAVES.

JD claimed Nana wanted her to write a letter saying she prostituted herself willingly and not because of GRAVES and that Nana and a woman named Unique stayed with her and would not let her leave until she wrote the letter. (RT 6: 302-304.) JD claimed she told the truth in court. (RT 6: 305.)

JD admitted that she was living on the streets when she met GRAVES. (RT 6: 309.) She testified her relationship with her grandmother was rocky and she had run away quite a few times. (RT 6: 309-310.) JD admitted that after she agreed to testify against GRAVES she received numerous government services, including schooling, clothes, living expenses and housing (which she did not accept). (RT 6: 310.) She claims she caught the shuttle to the airport in the morning; it was daylight. (RT 6: 310.) She did not know what motel this happened at. (RT 6: 314.) She claimed she was "with" GRAVES for about three months, leaving in December. (RT 6: 315.) She claimed she "lost it" a few weeks before the shuttle ride. (RT 6:

3

316.) She admitted she was active on social media well before she knew GRAVES. (RT 6: 316-317.)

Defense Trial Exhibits A and B (before redactions—Exhibit 4 herein) ---were documents depicting JD's Facebook and Instagram posts, respectively, in the relevant time frame. One such post depicts JD displaying money while wearing a crop top and sweats, with the money on her lap, and the post is dated months before she met GRAVES. (RT 6:318-320.) JD is then walked through a series of these social media posts that show her anger at her grandmother, her drug use, her prostitution, and other issues, all before she met GRAVES. RT 6: 320-322.) She said at one point that "street money comes and goes to fast." (RT 6: 322-323.) She admitted to using crystal meth, LSD, marijuana, and alcohol before meeting GRAVES. (RT 6: 323-324.)

On September 28, 2015, before she met GRAVES, she admitted she said she didn't need a job because "I'm getting more money than someone who got a job" through prostitution. (RT 6: 325.) She claimed that her grandmother beat her causing her to be sent to Kaiser hospital on January 8, 2016, and later posted that police might have given her a concussion. (RT 6: 326-327.) She admitted that she embellished things a lot at that time. (RT 6: 326.) She admits that she posted on Facebook that she lied on "Niggas" (which included GRAVES.) (RT 6: 331-332.) She admitted that she tattooed another man's name on her hand (Ray), that this was her idea as well. (RT 6: 333.) She admitted to lying about her age to post on Facebook and to GRAVES. (RT 6: 334-335.) She admitted that she posted a letter on April 4, 2016 saying GRAVES did not make her prostitute herself, she was doing so to get drugs (this letter was separate from the ones she gave to Nana). (RT 6: 335-337.) She also posted that all the police report statements she made about GRAVES were lies. (RT 6: 337.)
She admitted to taking provocative pictures of herself using a self-timer while GRAVES was in jail. (RT 6: 340-341.) JD admitted that GRAVES had no access to either her Facebook or Instagram passwords and could not post to her accounts. (RT 6: 344.) She claimed she posted these scantily clad pictures for the attention. (RT 6: 345.)

JD admitted she had a black eye when she went to Kaiser hospital three days before she claims to have fled GRAVES. (RT 6: 345-346.) She admitted she was transferred to a mental health bed. (RT: 346-347.) She admitted she told police at different points that GRAVES never assaulted her. (RT 6: 347.) She admitted she told police she got the black eye in a fight with Joan, and that she did not recall telling police that she was in a love triangle with Joan (who had GRAVES child). (RT 6: 346-348.) She also claimed she received the black eye in a fight with gang members. (RT 6: 350.) She admitted to trading sex for drugs well before she met GRAVES. (RT 7: 357-358.) She admitted that she posted on social media that she had decided "to use niggas like they use bitches." (RT 7: 359-360.)

JD's username on Instagram was "Paiddass-V." (RT 7: 359-360.) She admitted she had tattoos on her body before she met GRAVES. (RT 363-364.)

4

> She admitted she was never prosecuted for prostitution, for selling drugs, using drugs, or making false police reports about her grandmother. (RT 7: 370-371.) She does not recall if she first consented and then withdrew her consent for an exam at the hospital on December 9th. (RT 7: 371.) The incident where she falsely claimed her grandmother struck her started because she had punched holes in a wall while out of control. (RT 7: 375-376.)

Petition at 10-15. After the prosecution rested, the Defense did as well, presenting no evidence to rebut the prosecution's case. *Id.* at 18.

In the Petition, Petitioner points to what he contends is non-cumulative new evidence that shows that JD offered false testimony and that he is actually innocent (Ground One). *Id.* at 19. In particular, he offers "expert witness and fact witness declarations, as well as documentary evidence, all of which were not presented at trial." *Id.* The expert witness Petitioner now offers, Eugene Dey, is an expert in substance abuse and criminal thinking. *Id.* at 20. According to Petitioner, the defense offered at trial was that "JD was lying because she was mad at GRAVES at the time of her allegations." *Id.* (citing RT 9: 656-657, 671.) To accept that defense, however, the jury had to speculate about JD's state of mind whereas, an expert in substance abuse and criminal thinking could have "connected the dots" to show "that JD would have no trouble making serious false allegations in order to maintain her ability to stay high and that she would continue those lies over time." *Id.* Petitioner contends the expert report supplied by Mr. Dey is non-cumulative and would have filled in this gap in the defense to show that JD was a "predator in her own right" due to her addiction. *Id.* at 21 & Ex. 7.

Petitioner's counsel has also obtained a statement from Joan Andaya, the mother of Graves' child, who was involved in some of the relevant events and whose account contradicts JD's version. *Id.* at 22-223. According to Petitioner, Ms. Andaya's testimony would have created an alibi for him. *Id.* at 21. Ms. Andaya did not testify at trial. Petitioner has also obtained a statement for Anaya Cortez, who was with Petitioner at the Red Roof Inn on the night he was arrested and could have provided an alibi. *Id.* at 23. Like Ms. Andaya, Ms. Cortez did not testify at the trial.

In addition, Petitioner points to testimony his mother, Crystal Graves, could have offered about "bizarre" encounters she had with JD. *Id.* at 23. Although she provided these accounts to

trial counsel, Ms. Graves was not called to testify at trial. Ms. Graves has also obtained new evidence, in the form of bank statements and hotel reservation records, which she was able to obtain from Petitioner's email and bank accounts. *Id.* at 23-25. According to Petitioner, Ms. Graves' testimony "could have provided insight into JD's behaviors and it directly contradicted JD's claims about the methodology of her injuries—and their timing--the key facts in the case." *Id.* at 25. Likewise, the hotel booking and bank records would have cast doubt on whether Petitioner was a pimp and shown that he was not at the Red Roof Inn at the time when JD allegedly was beaten by him there. *Id.* at 25. According to Petitioner, this new evidence would show that JD gave false testimony that Petitioner struck her on December 8. *Id.* at 25-26. In combination with the testimony of Mr. Dey, this new evidence would also cast doubt on the veracity of JD's testimony about other alleged incidents of abuse by Petitioner. *Id.* at 27. Petitioner also contends the new evidence shows that JD was lying when she testified that Petitioner was profiting by pimping her. *Id.*

Further, according to Petitioner, Ms. Graves' research as to the platform where Petitioner allegedly posted ads selling JD's services, Thotlink, revealed that it is "a harvester site, merely compiling ads from other sites" and in this case, "was merely reposting JD's ads off Instagram or Facebook." *Id.* at 28. Given that the evidence at trial showed that JD had her Instagram and Facebook passwords and Petitioner did not, Petitioner contends this was crucial evidence that would have disproved "a central theory of the prosecutor's case." *Id*. (citing RT 6: 344, and Exhibit 1). Petitioner also argues that the expert testimony of Mr. Dey would have shown that JD offered false testimony that Petitioner coerced her into committing acts of prostitution. *Id.* at 28-29.

Petitioner further contends he received ineffective assistance of trial counsel (Ground Two) because: 1) trial counsel presented no affirmative defense even though it was obvious that cross-examination of JD by itself would be insufficient; 2) trial counsel failed to obtain essential financial and hotel booking records that were available and would have rebutted important aspects of the prosecution's case; 3) trail counsel failed to locate and present the testimony of witnesses who could have provided alibis or discredited JD's testimony (Andaya, Cortez and Crystal

6

Graves); 4) trial counsel did not obtain expert testimony as to JD's mental state; 5) trial counsel did not enter a no contest plea as to the witness dissuasion charges at the time of trial, even though guilt on this charge was not contested and thus the scope of the evidence on this charge could have been limited had they done so; and 6) trial counsel was ineffective in failing to advise Petitioner that a trial strategy of presenting no defense was unlikely to succeed and therefore Petitioner should accept the plea agreement being offered by the prosecution. *Id.* at 32-39. According to Petitioner, he also received ineffective assistance of counsel because his appellate counsel was unaware of and did not raise these challenges on appeal (Ground Three). *Id.* at 40.

Petitioner also contends "that arguments by the prosecutor made at RT 9: 640-642 and RT 10: 716-717 constituted prosecutorial misconduct that improperly diminished the proof beyond a reasonable doubt standard, shifted the burden of proof, and undermined the presumption of innocence [Ground Four]." *Id.* at 40-41. In Ground Five, Petitioner claims that his trial counsel and stand-in trial counsel were ineffective for the additional reason that they did not object to the prosecutor's misconduct. *Id.* at 41-42. Although Petitioner raised this issue on appeal and was unsuccessful, he contends with a vastly expanded record a different result should be reached. *Id.* at 42. Petitioner asserts in Ground Six that the cumulative prejudice of the ineffective assistance of counsel and the prosecutor's misconduct requires reversal of his conviction. *Id.* at 42-43.

Finally, Petitioner offers rebuttals of the superior court and appellate court orders rejecting these challenges. *Id.* at 43-50.

### III. ANALYSIS

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Courts should "award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243. Summary dismissal is appropriate only where the allegations in the petition are vague or conclusory, palpably incredible, or patently frivolous or false. *See Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990).

7

Petitioner asserts the following claims: 1) new evidence showing actual innocence (Ground One); 2) ineffective assistance of trial counsel (Grounds Two and Five); 3) ineffective assistance of appellate counsel (Ground Three); 4) prosecutorial misconduct (Ground Four); and 5) cumulative prejudice from ineffective assistance of counsel and prosecutorial misconduct (Ground Six). When liberally construed, these claims are cognizable in a federal habeas corpus action.

**IV. CONCLUSION**

1. The Clerk shall serve a copy of this order, the petition and all attachments thereto, and a magistrate judge jurisdiction consent or declination form on Respondent and Respondent's counsel, the Attorney General for the State of California.

2. No later than **October 12, 2021**, Respondent shall file an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be granted based on Petitioner's claims. Respondent shall file with the answer all portions of the state trial record that previously have been transcribed and that are relevant to a determination of the issues presented by the petition.

3. If Petitioner wishes to respond to the answer, he shall do so by filing a traverse with the Court no later than **November 9, 2021**.

4. In lieu of an answer, Respondent may file, no later than **October 12, 2021**, a motion to dismiss on procedural grounds, as set forth in the Advisory Committee Notes to Rule 4 of the Rules Governing Section 2254 Cases. If Respondent files such a motion, Petitioner shall file an opposition or statement of non-opposition no later than **November 9, 2021**, and Respondent shall file a reply no later than **November 23, 2021**.

5. Upon a showing of good cause, requests for a reasonable extension of time will be granted provided they are filed on or before the deadline they seek to extend.

**IT IS SO ORDERED.**

Dated: July 11, 2021

JOSEPH C. SPERO
Chief Magistrate Judge

8